**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PPO CHECK, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-3708 |
| | § | |
| MIDWESTERN REGIONAL MEDICAL | § | |
| CENTER, SOUTHWESTERN | § | |
| REGIONAL MEDICAL CENTER, and | § | |
| CANCER TREATMENT CENTERS OF | § | |
| AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This breach of contract case was removed from Texas state court based on federal diversity jurisdiction. The plaintiff, PPO Check, Ltd., is a Texas company. PPO Check contracts with hospitals to audit patient accounts in order to collect unpaid or underpaid amounts owing from third-party payors, such as insurers and employers. The defendants are two hospitals and a hospital management company. Midwestern Regional Medical Center is an Illinois hospital, Southwestern Regional Medical Center is an Oklahoma hospital, and Cancer Treatment Centers of America, Inc. is an Illinois company that manages both of the defendant hospitals.

The defendants have moved to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. (Docket Entry No. 3). PPO Check has responded, (Docket Entry No. 9), the defendants have replied, (Docket Entry No. 11), PPO

Check has surreplied, (Docket Entry No. 12), and the defendants have supplemented their reply, (Docket Entry No. 16).  The parties also presented oral argument on the motion to dismiss.

The issue is whether this Texas court has specific personal jurisdiction over the defendants.  Based on the present record, PPO Check does not contend that the defendants' contacts with Texas subject them to general personal jurisdiction.  Based on the pleadings, the motion, response, and replies, the parties' submissions, the arguments of counsel, and the applicable law, this court grants the motion to dismiss for lack of specific personal jurisdiction.  The reasons are set out below.

## I.      Background

The plaintiff, PPO Check, Ltd., is a Texas limited partnership with its principal place of business (and only physical location) in Houston, Texas.  PPO Check contracts with hospitals and other healthcare providers to audit patient accounts to identify whether insurance companies, network providers, and others responsible for payment are taking improper discounts, underpaying for other reasons, or simply failing to pay at all.

In April 2003, PPO Check entered into a Hospital Service Agreement ("Agreement") with Southwestern Regional Medical Center ("SRMC") and Midwestern Regional Medical Center ("MRMC").  Under the Agreement, PPO Check was to audit certain of the hospitals' patient accounts.  SRMC and MRMC are cancer hospitals located in Oklahoma and Illinois, respectively.  The Agreement identified "SRMC" and "MRMC" as "collectively, CTCA." However, CTCA is a separate entity from the two hospitals, SRMC and MRMC.  CTCA is

2

an Illinois corporation that manages MRMC and SRMC as well as cancer hospitals located in Philadelphia and Seattle. (Docket Entry No. 9 at 14 n.15). CTCA provides business services such as marketing, billing, and insurance administration to the hospitals it manages, including MRMC and SRMC. (Docket Entry No. 3, Ex. 1, ¶¶ 2–4).

The status of CTCA as a party to the Agreement is unclear and is not specifically addressed in the parties' briefs. "CTCA" is not defined in the Agreement as an entity that is itself a party to the Agreement, separate from and in addition to the two hospitals. Instead, the Agreement defines "CTCA" as SRMC and MRMC, the two hospitals. This apparent drafting problem leads to the incongruous result that because "CTCA" is the guarantor of the hospitals' obligations, the hospitals are both contracting parties and guarantors. (Docket Entry No. 9, Ex. 1, ¶ 4.2).[1]

Whether CTCA, the management company, is or is not a party to the Agreement does not alter the outcome of the specific jurisdiction analysis. As noted, this opinion does not

---

[1] Under Texas law, "A guaranty agreement creates a secondary obligation whereby the guarantor promises to be responsible for the debt of another and may be called upon to perform if the primary obligor fails to perform." *See Tenneco Oil Co. v. Gulsby Eng'g, Inc.*, 846 S.W.2d 599, 605 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (citing *Dann v. Team Bank*, 788 S.W.2d 182, 183 (Tex. App.—Dallas 1990, no writ)); *see also Republic Nat'l Bank v. Nw. Nat'l Bank*, 578 S.W.2d 109, 114 (Tex. 1978); *Eubank v. First Nat'l Bank*, 814 S.W.2d 130, 133 (Tex. App.—Corpus Christi 1991, no writ). A guaranty is, by definition, "an undertaking by a third person to another to answer for the payment of a debt, incurred by a named person, in the event that the named person fails to pay." *Eubank*, 814 S.W.2d at 133. "A guaranty requires three parties because it creates a secondary obligation whereby the guarantor promises to answer for the debt of another." *Dann*, 788 S.W.2d at 184. "In other words, by creating a secondary obligation to the creditor, the third person guarantees the performance of a primary obligation created by another." *See Eubank*, 814 S.W.2d at 133 (citing *Dann*, 788 S.W.2d at 183–84; *Republic Nat'l Bank*, 578 S.W.2d at 114). "To treat [the borrower or debtor] as the guarantor as well as the borrower would negate the purpose of the guaranty." *See Dann*, 788 S.W.2d at 184 (citing *Am. Petrofina Co. v. Bryan*, 519 S.W.2d 484, 487 (Tex. App.—El Paso 1975, no writ)).

address general personal jurisdiction.  In this opinion, "CTCA" (with quotation marks) refers to the defined term in the Agreement ("SRMC and MRMC," the two hospitals who are clearly parties to the Agreement); CTCA (without the quotation marks) refers to the management company that is a defendant in this suit in addition to the two hospitals.

In the Agreement, PPO Check agreed to audit patient accounts assigned by "CTCA" to identify and collect underpaid or unpaid patient accounts.  "CTCA" agreed to pay PPO Check fifty percent of the amounts collected on the audited accounts.  On October 26, 2006, PPO Check sued the defendants in a Harris County, Texas state court, alleging breach of the Agreement.  PPO Check alleges that it has recovered $2 million and identified another $15 million in unpaid discounts on patient accounts at MRMC and SRMC taken by Multiplan, Inc., a network provider located outside Texas.  PPO Check alleges that the defendants used information from the audit, showing that Multiplan had not paid or had improperly discounted nearly $15 million, to negotiate a beneficial new contract with Multiplan. According to PPO Check, as part of their new contract with Multiplan, the defendants agreed to release Multiplan from liability for the approximately $15 million in unpaid or underpaid accounts.  In this lawsuit, PPO Check alleges that it is entitled to receive fifty percent of the benefit the defendants received from the Multiplan account audit.

The defendants challenge personal jurisdiction over them.  The parties have submitted the Agreement and affidavits from party representatives knowledgeable about the

negotiations that preceded the Agreement and about the parties' performance under the Agreement.

It is undisputed that PPO Check solicited the Agreement between the parties. The negotiations occurred in Illinois. A PPO Check representative traveled from Texas to Illinois to discuss the proposal that led to the Agreement. No one from SRMC, MRMC, or the management company, CTCA, traveled to Texas in connection with the contract negotiations. The parties had discussions and exchanged drafts by telephone, email, and fax from their respective locations. PPO Check executed the Agreement in Texas; the defendants executed it in Illinois.

The Agreement states that PPO Check, acting as the defendants' independent contractor, was to audit patient accounts assigned by "CTCA" and "recover unpaid or underpaid claims, including, without limitation, silent PPOs, erroneous managed-care discounts, timely payment violations, underpayments, and wrongful denials." (*Id.*, ¶ 1.3(b)). The Agreement states that PPO Check would use "reasonable efforts" to recover unpaid or underpaid claim amounts due the defendants. The Agreement term was "for such reasonable period of time that would enable PPO Check to adequately resolve all accounts and related claims." (Docket Entry No. 9, Ex. 1, ¶ 5.1).

Under the Agreement, the defendants would assign to PPO Check the accounts to be audited and would provide PPO Check with the information on those accounts necessary for PPO Check to audit them fully. The Agreement states that "CTCA" would cooperate fully

5

in providing PPO Check with documents, information, and physical access to "CTCA" offices as needed to perform the audits.  (*Id.*, ¶ 2.1).  "CTCA" also agreed to "promptly respond [to] inquiries made by PPO Check personnel."  (*Id.*).

If PPO Check's audit and collection efforts were successful, the payors would remit payment directly to the hospitals or CTCA.  PPO Check did not receive payment from the payors.  Instead, the defendants would send PPO Check its share of the payments received.  The Agreement provides that "CTCA" would "issue payment to PPO Check at Harris County, Texas."  (Docket Entry No. 9, Ex. 1, ¶ 3.1).

In the Agreement, "CTCA" agreed that PPO Check was to be the exclusive provider of account auditing services during the Agreement term.  (Docket Entry No. 9, Ex. 1, ¶ 4.1).  "CTCA" also "unconditionally and irrevocably" guaranteed the hospitals' payment obligations to PPO Check under the Agreement and agreed to indemnify PPO Check.  (*Id.*, ¶¶ 4.3, 4.4).

The Agreement had a Texas choice-of-law clause.  (*Id.*, ¶ 7.7).  "CTCA" was to give PPO Check notice through its Vice-President, Gary Stankowski, at PPO Check's Houston, Texas address.  (*Id.*, ¶ 7.1).

CTCA sent account information to PPO Check's office in Houston, Texas.  (Docket Entry No. 9, Ex. 2, ¶ 6).  PPO Check, working from its Houston office, then reviewed the files and approached the third-party payors about amounts PPO Check identified as underpaid or unpaid.  PPO Check communicated with the payors by telephone, email, or

regular mail.  PPO Check and the defendants communicated by telephone, email, or regular mail, with PPO Check representatives in Texas and the defendants in Illinois or Oklahoma.

PPO Check asserts that "the auditing and collection process required PPO Check and Defendants to engage in frequent and extensive communications, both (1) directly with each other, and (2) in concert in their collective communications with deficient payors." (*Id.*, ¶ 5).  PPO Check contends that in connection with its auditing services, it exchanged "thousands of emails and hundreds of phone calls with the Defendants, many of which were extremely detailed and involved."  (*Id.*).  PPO Check asserts that the defendants' representatives frequently worked with PPO Check in contacting or drafting letters to various payors, including Texas payors.  In some cases, according to PPO Check, the defendants contacted the payors, including Texas payors, without PPO Check's direct involvement.  (*Id.*, ¶ 7).  In an affidavit, Gary Stankowski, the Vice-President of PPO Check, states that the defendants asked his advice on several occasions concerning the Multiplan accounts, which are the basis of this lawsuit.  (Docket Entry No. 21, Ex. A).  Stankowski asserts that in these conversations, the defendants asked and received his advice on restructuring the Multiplan contract, using the information PPO Check had learned about the Multiplan accounts through its auditing work.  (*Id.*).  As noted, Multiplan is not a Texas company.  The communications between the defendants and PPO Check about Multiplan were by telephone and email, with PPO Check in Houston, Texas and the defendants in Illinois or Oklahoma.

PPO Check states that it audited 8,457 claims on the defendants' behalf between April 2003 and October 2006.   Of these claims, 1,821—or 21%—involved Texas patients, networks, or payors.   PPO Check recovered more than $5 million on the defendants' behalf. Of that amount, $1,843,769.31—or 36%—was recovered from Texas payors.  (Docket Entry No. 9, Ex. 2, ¶ 6).

PPO Check argues that the defendants have contacts with Texas that support specific personal jurisdiction.  PPO Check emphasizes the fact that the Agreement contains a choice-of-law clause specifying Texas law.  PPO Check also emphasizes that because its only location is in Houston, it was foreseeable to the defendants that PPO Check would perform its auditing services under the Agreement in Texas.  PPO Check points out that there were "extensive and ongoing contacts" between the defendants with PPO Check in Texas, including contacts relating to Texas payors and to Multiplan.  (Docket Entry No. 9 at 11).[2]

The defendants argue that their conduct in connection with the formation, terms, and performance of the Agreement does not support a finding of specific personal jurisdiction. The defendants submit affidavits showing that they have not performed services, sold

---

[2]  PPO Check also alleges that CTCA directs its services toward Texas by entering into provider agreements with Texas-based healthcare provider networks; runs television advertisements in Texas; conducts or sponsors marketing and training seminars in Texas; and maintains an ongoing relationship with a Texas-based advertising agency.  (Docket Entry No. 9 at 10).  These Texas contacts do not arise out of or relate to the breach of contract cause of action asserted in this case.  They are properly addressed in a general jurisdiction analysis, *see Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006); *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986), but are not relevant to the specific jurisdiction issue analyzed in this opinion.

products, or entered into any transaction, contract, or agreement in Texas; have not maintained an office, agent, or employee in Texas; have not recruited Texas residents for employment inside or outside of Texas; and have not committed a tort or conducted activities in Texas.  (Docket Entry No. 3, Ex. 1).  None of their employees has traveled to Texas in connection with the Hospital Service Agreement.  The defendants acknowledge that when they contracted with PPO Check, they knew that PPO Check's office was located in Texas, but assert that this was a mere fortuity, making the place of PPO Check's performance under the Agreement incidental to the Agreement.  They emphasize that the location of PPO Check's work under the Agreement is not sufficient to establish personal jurisdiction in that forum.  The defendants emphasize that their own performance under the Agreement took place in Illinois or Oklahoma, not Texas.  The defendants emphasize that the Texas choice-of-law clause is not a choice-of-forum clause and does not determine whether specific personal jurisdiction is present.

These arguments are analyzed in light of the record evidence and the authorities on specific personal jurisdiction in a breach of contract suit.

## II.    The Applicable Law

In a diversity case, a federal court may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant and (2) the exercise of such jurisdiction comports with due process under the U.S. Constitution.  *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*,

176 F.3d 867, 871 (5th Cir. 1999).  Because the courts interpret the Texas long-arm statute to extend as far as due process permits, the inquiry is whether the exercise of personal jurisdiction over a nonresident defendant comports with federal constitutional due process requirements. *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003); TEX. CIV. PRAC. & REM. CODE §§ 17.041–17.045.  The due process inquiry focuses on whether the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007).  "A defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [the defendant] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).  "There must be some act whereby the [nonresident] defendant 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'"  *Id.*

A plaintiff bears the burden of demonstrating facts sufficient to support personal jurisdiction over a nonresident defendant.  "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).  Where, as here, the district court does not hold an evidentiary hearing on the issue,

10

that burden is met by a *prima facie* showing; proof by a preponderance of the evidence is not necessary. *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003); *see also Kwik-Kopy Corp. v. Byers*, No. 01-20748, 2002 WL 10218889, at *4 (5th Cir. May 9, 2002) (unpublished opinion) (concluding that the district court did not hold an evidentiary hearing on the defendant's motion to dismiss; although the court held a hearing in which argument was heard and deposition testimony was entered into evidence, the district court did not allow the testimony of witnesses).   "[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985); *see also Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000).

Minimum contacts can be established through "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).  PPO Check contends that the defendants' contacts with Texas give rise to specific personal jurisdiction.  (Docket Entry No. 9 at 2).  A court may exercise specific jurisdiction when (1) the nonresident defendant purposely availed itself of the privileges of conducting activities in the forum state, and (2) the controversy arises out of or is related to the defendant's contacts with the forum state.  *Freudensprung v. Offshore Tech. Serv.*, 379 F.3d 327 (5th Cir. 2004) (citations omitted); *Liebreich*, 339 F.3d at 375;

*Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002); *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 446 U.S. 408, 414 n.8 (1984)).  To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice."  *Gundle Lining*, 85 F.3d at 205.

In a breach of contract case, specific personal jurisdiction cannot be based merely on the fact that a nonresident defendant has entered into a contract with a resident.  *Freudensprung*, 379 F.3d at 344 (citing *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986)).  Courts look to multiple factors to determine whether the defendant's contacts with the forum state are too random, fortuitous, or attenuated to establish jurisdiction.  *Id.*  The factors include whether the nonresident defendant solicited the contract in the forum state; where the contract was negotiated; where the contract was executed; the contract terms, including any forum-selection and choice-of-law clauses; whether the contract called for a long-term relationship between a forum resident and a nonresident defendant; and the place of performance.  *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 94 (5th Cir. 1992); *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068–69 (5th Cir. 1992); *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1007 n.2 (5th Cir. 1982).

The place of performance is a "weighty consideration" but not "automatically determinative" of personal jurisdiction.   *See Electrosource, Inc.*, 176 F.3d at 874; *Command-Aire Corp.*, 963 F.2d at 94.   Although the place of performance is important, a forum plaintiff's or third party's unilateral activities cannot establish minimum contacts between the defendant and the forum state. *Moncrief*, 481 F.3d at 311, 313.   "Otherwise, jurisdiction could be exercised based only on the fortuity that one of the parties happens to reside in the forum state." *Id.* at 311.   While a nonresident defendant may not be sued in a forum because of fortuitous contacts or the unilateral activity of another party, jurisdiction is proper based on contacts that "proximately result from actions by the defendant *himself* that create a substantial connection with the forum State." *Stuart*, 772 F.2d at 1191 (quotations and citations omitted).   "For example, 'with respect to interstate contractual obligations, [the Court has] emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulations and sanctions for the consequences of their activities.'" *Id.* (quoting *Burger King*, 471 U.S. at 473).

## III.   Analysis

### A.   Where the Agreement Was Solicited, Negotiated, and Executed

It is undisputed that PPO Check initiated the discussions with the defendants, soliciting them to enter the Agreement.   It is also undisputed that a PPO Check representative traveled from Texas to Illinois to discuss the proposal that led to the Agreement.   No

representative of the defendants went to Texas in connection with the negotiation or execution of the Agreement (or, for that matter, in connection with any aspect of the Agreement). Other than the one visit by a PPO Check representative to CTCA in Illinois, it appears that all the communications between PPO Check and CTCA relating to the negotiation and execution of the Agreement were by telephone, mail, and email. PPO Check executed the Agreement in Texas and sent it to Illinois for the defendants' signature; a CTCA representative signed the Agreement and returned it to PPO Check by mail.

The cases make it clear that just as a nonresident's solicitation of a forum plaintiff to enter a contract supports a finding of personal jurisdiction over the nonresident, so a forum plaintiff's solicitation of a nonresident defendant to enter a contract weighs against finding personal jurisdiction over the nonresident. In *Stuart v. Spademan*, 772 F.2d 1185 (5th Cir. 1985), the Fifth Circuit affirmed the district court's dismissal for lack of jurisdiction over a nonresident defendant. A Texas plaintiff had solicited the nonresident defendant to enter into a contract, the parties engaged in written and telephonic communications during the contract's negotiation, and the defendant had not traveled to Texas in connection with contract formation or performance. Despite the facts that the defendant knew that the plaintiff was in Texas; that the defendant performed the contract by shipping products to the plaintiff in Texas and by mailing payments to the plaintiff in Texas; and that the parties' contract contained a Texas choice-of-law clause, specific personal jurisdiction did not exist over the nonresident defendant. *Stuart*, 772 F.2d at 1192–94 (citing *Hydrokinetics, Inc. v.*

*Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983)).  Similarly, in *Holt Oil & Gas*, 801 F.2d at 777–78, the Fifth Circuit affirmed the district court's finding that the nonresident defendant's contacts with Texas were insufficient to support a finding of specific personal jurisdiction.  The Texas plaintiff in that case contacted the Oklahoma defendant to solicit a joint operating agreement in an oil drilling project in Oklahoma.  The Oklahoma defendant executed the agreement in Oklahoma and sent it to the plaintiff in Texas.  Despite the facts that the defendant mailed the final version of the parties' agreement to Texas, sent three payments from Oklahoma to Texas, and engaged in "extensive telephonic and written communication" with the Texas plaintiff, the court found no jurisdiction in Texas.  *Id.*; *see also Hydrokinetics*, 700 F.2d at 1028–29 (no specific jurisdiction in Texas when the resident plaintiff solicited the nonresident defendant's business, despite the facts that the defendant agreed to purchase goods manufactured in Texas and engaged in "extensive communications" with the plaintiff before the contract was executed, and the defendant's officers traveled to Texas to execute the agreement).

The facts that PPO Check initiated and solicited the Agreement; that PPO Check traveled to Illinois to negotiate the Agreement; that the defendants negotiated and executed the Agreement in Illinois; and that the defendants did not travel to Texas to negotiate or execute the Agreement weigh against finding specific personal jurisdiction over the defendants.

### B.    The Terms of the Agreement

The Agreement did not specify the location of the parties' performance. Although PPO Check had only one office, located in Houston, nothing in the Agreement stated where PPO Check was to perform its audit and collection work. It is not enough that a nonresident enters into a contract with a known resident of the forum state, even if it is reasonably foreseeable that the resident will perform a material part of its obligations in the forum state. *See Moncrief*, 481 F.3d at 313. In *Moncrief*, the Texas plaintiff argued that the nonresident defendant knew that much of the oil-field analysis called for under the parties' contract would be done in the plaintiff's Texas office. The Fifth Circuit stated that "[m]ere foreseeability, standing alone, does not create jurisdiction." *Id.* The court rejected the broad proposition that "minimum contacts exist in a breach of contract case where a nonresident enters into a contract with a known resident of the forum state, if it is reasonably foreseeable that the resident will perform a material part of its obligations in the forum state." *Id.* at 312.

In *Moncrief*, the court emphasized that the plaintiff was an international company based in Texas. Much of the contract work was performed in Texas, and a representative of the defendant came to Texas for a visit in furtherance of that performance. However, the contract was silent as to where the work would be performed. The court concluded that even though the plaintiff substantially performed its contract obligations in Texas, which was foreseeable to the defendant, "[g]iven the nature of the work, there's no indication that the location of the performance mattered, and it is not clear how performance of that work would cause business activity" centered in Texas. *Id.* at 313. The court contrasted two earlier

16

cases, *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376 (5th Cir. 2003), and

*Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003 (5th Cir. 1982), on the

grounds that in those cases, the "hubs of activity" were within the forum state; the plaintiffs

only existed within the forum state; the defendants benefitted from the plaintiffs' Texas

location, which was important to the agreements; and the defendants were actively engaged

in the "various activities" taking place in the forum state. *Id.*

    In *Central Freight Lines*, 322 F.3d at 381–83, the Fifth Circuit found that the parties'

contractual relationship supported a finding of minimum contacts.  In that case, the resident

plaintiff, a trucking company based in Texas, entered into a long-term agreement with the

nonresident defendant, a trucking company based on the east coast.  Under the contract, each

committed to use the other's shipping services in the other company's primary market.  *Id.*

at 379.  The nonresident defendant sent two representatives to meet with the plaintiff in

Texas "with the hope of finding a partner in Texas to interline freight to the East Coast."  *Id.*

at 382.  Negotiations also took place by telephone and regular mail between the two parties

from their respective headquarters.  The court noted that the nonresident defendant not only

knew that it was contracting with a Texas resident, but that the defendant knew that its

actions would create substantial business activity in Texas.  The Fifth Circuit found that the

place of performance under the contract was material to the contract.  Because the

nonresident defendant benefitted from the fact that the contract would be performed in

significant part in Texas, that defendant could reasonably expect to be haled into a Texas court on matters related to the contract. *Id.* at 383.

In *Transpo*, the plaintiff, a trucking firm that had only a Mississippi office, agreed to supply trucks to move goods for Transpo, a California freight broker, on an open-account basis. *Transpo*, 681 F.2d at 1005–06. The plaintiff made nineteen shipments on Transpo's behalf during the parties' two-month relationship. None of the nineteen shipments originated or ended in Mississippi, although some of the shipments were routed through that State or otherwise passed through Mississippi Interstate's headquarters for truck maintenance. The invoices directed Transpo to send payments to Mississippi Interstate's office in Mississippi. Transpo's failure to make any of the invoiced payments formed the basis of Mississippi Interstate's suit. Transpo moved to dismiss for lack of personal jurisdiction over it in Mississippi.

The Fifth Circuit stated that although the parties' relationship lacked a "clear local nexus with any particular jurisdiction," the fact that Transpo directed Mississippi Interstate's movement of trucks from Mississippi to places across the nation established Mississippi as the "hub of the parties' activities." *Id.* at 1010. The court noted that:

> [i]n view of the nature of the business of brokering interstate trucking services, it is hardly surprising that the defendant's contacts with any single jurisdiction are comparatively fleeting and slight. We conclude that it is both reasonable and just to require lesser forum contacts of a non-resident defendant in the context of the present facts than have been found necessary to sustain jurisdiction over defendants whose activities have, both generally and with respect to the transaction giving rise to the

> controversy, a more purely local character.  To hold otherwise would tend to immunize from suit by anyone with whom they do business, in any but their home jurisdiction, those engaged in nationwide commercial activity who conduct extensive commercial activity in other jurisdictions primarily by telephone or through the mails.

*Id.*

In this case, the Agreement did not specify where PPO Check would do its work.  The services it offered could have been provided from almost anywhere.  The record does not suggest that PPO Check's place of business was a consideration in the defendants' decision to enter into the Agreement or that they benefitted from the Texas location of PPO Check's office, unlike the facts that supported jurisdiction in *Central Freight*.  The nature of PPO Check's auditing work did not make it foreseeable that engaging its services would create substantial business activity in Texas.  The recipients of the collected funds were not in Texas; SRMC is located in Oklahoma and MRMC is in Illinois.  The third-party payors PPO Check audited and contacted to collect money owing on unpaid or underpaid patient accounts were located throughout the United States; only approximately twenty percent were in Texas.

The nature of the defendants' business, both generally and with respect to the disputes made the basis of this suit, was not of a national nature, as was that of the freight broker in *Transpo*, so as to justify requiring "lesser forum contacts" than are ordinarily required. *Transpo*, 681 F.2d at 1010.  To the contrary, the defendants are generally engaged in activities that are local in nature: providing healthcare services through a hospital in Illinois

and Oklahoma and providing management services for those hospitals.  The defendants'
collection activities, which are the subject of this dispute, are less "purely local" in nature,
but only because the third-party payors conduct their business on a national basis.  The
unilateral conduct of third parties cannot give rise to personal jurisdiction over a nonresident
defendant.  *See Moncrief*, 481 F.3d at 312–13; *Transpo*, 681 F.2d at 1009.  Moreover, in
*Transpo*, the court required that the nonresident defendant's activities—both generally and
with respect to the transaction giving rise to the suit—have more than a "purely
local character" before reducing the forum contacts required for personal jurisdiction over that
nonresident.  In this case, the defendants' general activities are local in nature, even if their
collection activities are not.   In short, the circumstances surrounding the place of
performance that led the court in *Transpo* to reduce the forum contacts required of the
nonresident defendant are not present on this record.

    Here, as in *Central Freight Lines* and *Transpo*, the Agreement is silent as to the place
of performance and the plaintiff's only physical location was in the forum state.  Here, unlike
*Central Freight Lines*, the place of performance was not material to the Agreement and did
not benefit the defendants and did not create substantial business activity focused in Texas.
Here, unlike *Transpo*, there is no basis to apply a reduced standard for forum contacts to the
nonresident defendants.  There is no contractual provision specifying performance in the
forum.  Minimum contacts require more than a showing that the nonresident defendant

reasonably foresees that the resident plaintiff will perform contractual obligations in the forum state. *Moncrief*, 481 F.3d at 312.

The Agreement did require the defendants to send payments to PPO Check in Houston.  The case law is clear that requiring a nonresident defendant to send contract payments to a forum resident does not weigh strongly in favor of specific personal jurisdiction. *See Holt Oil & Gas*, 801 F.2d at 778; *Stuart*, 722 F.2d at 1194; *Hydrokinetics*, 700 F.2d at 1028–29.

The Agreement also required the defendants to assist PPO Check by sending files—electronically and by mail—to Texas, as well as by providing physical access to the defendants' offices in Oklahoma and Illinois to obtain information about the files and accounts to be audited.  The defendants were also required to provide PPO Check other requested information about those files and accounts.  These obligations do not require performance by the defendants in Texas.


The defendants' activities under the contract did not occur in Texas so as to support personal jurisdiction in that State.  As in *Stuart*, the defendants engaged the services of a Texas company; the contracts at issue in both cases contained a Texas choice-of-law provision and the nonresident defendants in both cases remitted payment by mail to the Texas plaintiffs.  In both *Stuart* and in the present case, the nonresident defendants engaged in communications with the plaintiffs before and during the performance of the contracts.

As the Fifth Circuit noted, "[t]he quality of the contacts as demonstrating purposeful availment is the issue, not their number or their status as pre- or post-agreement communications." *Stuart*, 772 F.2d at 1194.

In *Stuart*, the court observed that the parties' contract "did not contemplate a long-term relationship with the kinds of continuing obligations and wide-reaching contacts envisioned by the *Burger King* contract." *Id.* In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), the nonresident defendants actively solicited the business of Burger King in the forum state, Florida, and the parties entered into a twenty-year franchise agreement that was governed by Florida law. *See Burger King*, 471 U.S. at 465–66. Here, the Agreement was to last "for such a reasonable time that would enable PPO Check to adequately resolve all accounts and related claims." (Docket Entry No. 9, Ex. 1, ¶ 5.1). However, the defendants made the determination of the accounts PPO Check was to audit, (*id.*, ¶ 1.1), and either party could terminate the Agreement with or without cause, (*id.*, ¶ 5.2). The length of the contemplated relationship between the defendants and PPO Check contemplated more than one or a few transactions but had no definite term.

The Agreement also called for the application of Texas law. A choice-of-law clause by itself does not create personal jurisdiction but is a factor in the minimum-contacts analysis. *See Stuart*, 772 F.2d at 1195 ("[C]hoice-of-law provisions warrant some weight in considering whether a defendant has purposefully invoked the benefits and protection of a

state's laws for jurisdictional purposes, 'although such a provision standing alone would be insufficient to confer jurisdiction.'" (quoting *Burger King*, 471 U.S. at 482)).

The choice-of-law provision in the Agreement states, "The laws of the state of Texas shall govern this Agreement."  (Docket Entry No. 16, Ex. A).  Before the Agreement was executed, the defendants struck language stating that Texas would be the exclusive forum for any disputes.  (*Id.*).  The deleted provision stated:  "The laws of the state of Texas shall govern this Agreement and the courts of such state shall have the sole and exclusive jurisdiction of any dispute related hereto arising hereunder."  (*Id.*).  Although the parties dispute their intent in agreeing to the revised language, they agree that the result is to remove Texas as the exclusive forum while leaving it as an available forum.[3]

The cases discussing the impact of a choice-of-law clause on the minimum-contacts analysis fall into three categories.  If there is no choice-of-law clause specifying the forum's law, that weighs against finding minimum contacts because that basis for putting the nonresident on notice that it might be haled into court in the forum state is absent.  *See Central Freight Lines*, 322 F.3d at 383 ("Although the . . . Agreement apparently does not contain a forum selection clause, a choice of law clause, or some other provision that could have put [the defendant] on specific notice that it might be amenable to suit in Texas, neither

---

[3]  Stankowski stated in his affidavit that "the only effect I believed that deletion to have was that Texas would no longer be the 'sole and exclusive' jurisdiction for disputes arising from the contract.  I did not understand that deletion to mean that Defendants believed they were not subject to suit in Texas at all, nor would I have agreed to entirely forego PPO Check's right to bring suit in this state altogether."  (Docket Entry No. 19, Ex. 2).

does the Agreement contain any provision that would give [the defendant] reason to think that it could not be haled into court in Texas . . . .").  If there is a choice-of-law clause specifying another forum's law, that weighs heavily against finding minimum contacts in the forum, because it suggests that the forum is not the center of the undertaking.  *See Moncrief*, 481 F.3d at 313 (noting that the presence of a choice-of-law clause specifying Russian law suggested that the defendant's contractual activities were not purposefully directed toward Texas); *Holt Oil & Gas*, 801 F.2d at 778 ("Although the contractual relationship between [the parties] may have been cemented in Texas, the significance of this fact is diminished by the contract provision specifying that Oklahoma law would govern the agreement."); *Hydrokinetics*, 700 F.2d at 1029 (discussing the importance of an Alaska choice-of-law clause).  When, as here, there is a choice-of-law clause specifying the application of the forum's law, that factor weighs in favor of finding minimum contacts in the forum.  *See Stuart*, 772 F.2d at 1194–95 (stating that the Texas choice-of-law clause was one factor in support of finding personal jurisdiction).[4]

---

[4] In *Gundle Lining Construction Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201 (5th Cir. 1996), the Fifth Circuit addressed whether a nonresident who contracted with a Texas company, mailed payments to that company, and engaged in communications with the company during negotiations and performance of the contract could support a minimum-contacts finding.  The court, citing *Stuart*, noted that such contacts were not sufficient but went on to distinguish the facts in *Stuart*.  *Id.* at 205–07.  The key distinction between the cases was that the contract in *Gundle Lining* contained a provision that allowed suit to be brought in the state in which labor was performed, services were rendered, or materials were furnished.  *Id.* at 206.  Although acknowledging that the provision was neither a choice-of-law clause nor a choice-of-forum clause, the court found that it "resemble[d] the latter."  *Id.*  The court reasoned that the choice-of-forum clause weighed "heavily against [the nonresident's] contention that the Texas court's decision to exercise jurisdiction over it would somehow be unreasonable."  *Id.*  The absence of a choice-of-forum clause distinguishes this case from *Gundle Lining*.

In a recent unpublished opinion, the Fifth Circuit gave little weight to a choice-of-law clause in the

24

The only term of the Agreement that weighs in favor of exercising jurisdiction over the defendants is the Texas choice-of-law clause.  Absent a provision specifying performance in Texas (other than to send PPO Check files and its checks in Texas), the fact that it was foreseeable that PPO Check would perform its contractual obligations from its office in Texas does not create personal jurisdiction over the defendants, given the nature of their business activities both generally and specifically relating to this case and given the nature of PPO Check's contractual activities.  *See Moncrief*, 481 F.3d at 313; *Stuart*, 772 F.2d at 1195.  The critical facts are not the location of PPO Check's activities, which could have been done anywhere but were done in Texas because of the fortuity that its office was in Texas.  Rather, the critical fact is the defendants' involvement in the activities taking place in Texas under the Agreement.  When, as here, the parties do not contract for work to be done in the forum, the court must look to where the "hub of the parties' activities" occurred under the contract and the extent to which the defendants' contractual performance took place in the forum state.  *See Moncrief*, 481 F.3d at 312–13; *Transpo*, 681 F.2d at 1009.

## C.    The Course of Performance

The record as to the parties' course of performance under the Agreement appears undisputed.  The record shows that the defendants performed their obligations under the

---

parties' contract that specified Texas law because of the clause's "dubious origin."  *Renoir v. Hantman's Assocs., Inc.*, No. 06-20442, 2007 WL 954321, at *3 (5th Cir. March 27, 2007) (unpublished opinion).  The record in that case showed that during negotiations, the clause was changed from Maryland law to Texas law, although neither party recalled making the change and accused each other of doing it.  The court noted that "it is disputed here whether [the defendant] even knew the provision had been changed."  *Id.*  In this case, there are no uncertainties as to whether the parties knew that the choice-of-law clause was in the Agreement.

Agreement from Illinois or Oklahoma.  No defendant traveled to Texas.  "CTCA" sent account information to PPO Check's office in Houston, Texas, either electronically or by conventional mail.  (Docket Entry No. 9, Ex. 2, ¶ 6).  PPO Check personnel in Houston would review the files and contact the third-party payors about the accounts, again primarily by mail, email, or telephone.  PPO Check asserts that "the auditing and collection process required PPO Check and Defendants to engage in frequent and extensive communications, both (1) directly with each other, and (2) in concert in their collective communications with deficient payors."  (*Id.*, ¶ 5).  PPO Check contends that in connection with its auditing services, it exchanged "thousands of emails and hundreds of phone calls with the Defendants, many of which were extremely detailed and involved."  (*Id.*).  These contacts occurred from the parties' respective offices; as noted, the defendants did not visit Texas in connection with the performance of the Agreement.

As noted, PPO Check states that it audited 8,457 claims on the defendants' behalf between April 2003 and October 2006, 1,821 of which involved Texas patients, networks, or payors.  PPO Check also states that it recovered more than $5 million on the defendants' behalf, of which $1,843,769.31 was recovered from Texas payors.  (Docket Entry No. 9, Ex. 2, ¶ 6).  PPO Check cites numerous occasions in which the defendants' representatives worked with PPO Check in contacting various payors, including those from Texas.  The defendants would work with PPO Check to draft letters to payors, including those from Texas.  In some cases, the defendants contacted payors without PPO Check's assistance.

26

(*Id.*, ¶ 7).  The defendants had the same kind of involvement with both the Texas and the non-Texas accounts that PPO Check audited.  Stankowski's affidavit states that CTCA requested his advice on several occasions about the accounts involving the non-Texas payor, Multiplan, which is at issue in this case.  (Docket Entry No. 21, Ex. A).  The affidavit states that Nora Orrick, a CTCA Vice-President, communicated with Stankowski at his Houston office by email and telephone at least six times between January 8, 2005 and January 27, 2005 about Multiplan.  (*Id.*).  Stankowski asserts that in these conversations, CTCA asked for and received his advice on restructuring the Multiplan contract using the information PPO Check had learned about the Multiplan accounts through its auditing work.

The record shows that the defendants' conduct  in performing the Agreement was to send information from Illinois or Oklahoma to Texas; to communicate by mail, email, or telephone from Illinois or Oklahoma with PPO Check in Texas; and to send checks to PPO Check in Texas.  A number of cases find that similar combinations of activities in contract performance are inadequate to show minimum contacts over a nonresident defendant.

In *Stuart v. Spademan*, 772 F.2d at 1187–88, a nonresident defendant entered into a contract solicited by Texas plaintiffs to modify the defendant's patented ski equipment.  The defendant shipped goods to Texas for modification and exchanged letters and telephone calls with the plaintiffs.  *Stuart*, 772 F.2d at 1192–94.  The agreement provided that the defendant would pay the plaintiffs in Texas; the defendant made eight such payments.  The agreement called for an ongoing relationship between the parties, stating that the defendant was to

engage the plaintiffs' services in future attempts to reissue the defendant's patent.  The agreement's choice-of-law clause stated that it would be construed and enforced in accordance with the law of the state in which the aggrieved party resided at the time of any breach.  The Fifth Circuit held that although the choice-of-law clause arguably put the defendant on notice that Texas law could apply, the district court lacked personal jurisdiction over the nonresident defendant.  *Id.* at 1193–96.  The court stated that because the quality of contacts predominated over the number or timing, the contacts were not sufficient to show purposeful availment by the defendant of the Texas forum.  *Id.* at 1194.

Similarly in *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), minimum contacts did not exist where the nonresident agreed to purchase goods manufactured in Texas; payment was to be made in Texas; the parties engaged in communications before the agreement; nonresident officers of the company visited Texas to close the deal; and the contract was accepted in Texas.  *Hydrokinetics*, 700 F.2d at 1028–29.  The court noted that the nonresident defendant's sole contact with the forum was the transaction involved in the case.  *Id.* at 1029.  As to "the exchange of communications . . . in development of the contract, that in itself is also insufficient to be characterized as purposeful activity invoking the benefits and protections of the forum state's laws."  *Id.*

In *Freudensprung v. Offshore Technology Services*, 379 F.3d 327, 344 (5th Cir. 2004), the Fifth Circuit stated that "merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction."  The plaintiff,

28

Freudensprung, brought Jones Act and other maritime claims for injuries he sustained while working aboard a barge in Nigerian waters. Freudensprung sued OTSI, a Texas-based contractor that supplied personnel to work on the barge, and WWAI, the barge's Panamanian owner and operator. WWAI challenged the Texas court's jurisdiction. The parties' dispute centered around two contracts: a "Consultant's Agreement" between OTSI and Freudensprung; and an "Offshore Personnel Supply Agreement" between OTSI and WWAI. The "Consultant's Agreement" contained a Texas arbitration clause and the "Offshore Personnel Supply Agreement" stated that English law would apply to any dispute between the parties. The court assumed that the dispute arose out of the "Offshore Personnel Supply Agreement." The court examined the contract formation, terms, and performance and found no personal jurisdiction in Texas. The court summarized: "[T]his Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant." *Id.* Even though substantial communications occurred between the nonresident defendant WWAI and other parties who were in Texas, WWAI wired money into Texas, and WWAI engaged in a long-term relationship with a Texas company, the court found persuasive the facts that material portions of the contract obligations were not to be

29

performed in Texas but in Africa, and that the "Offshore Personnel Supply Agreement" contained an English choice-of-law clause. *Id.* at 345.

In *Holt Oil & Gas*, 801 F.2d at 778, the fact that the defendants' as well as the plaintiff's contract performance was to occur in Oklahoma rather than in Texas was a significant factor in the Fifth Circuit's conclusion that the defendant lacked minimum contacts with Texas. The plaintiff, a Texas oil and gas company, contracted with an Oklahoma-based oil and gas investor to participate in a joint operating agreement covering a proposed well in Beaver County, Oklahoma. Under the parties' agreement, which contained an Oklahoma choice-of-law clause, the plaintiff was to drill the well and the Oklahoma defendant would pay a pro rata share of the drilling costs. Although the defendant was to mail payments to the plaintiff's Texas office and engaged in written and telephonic communications with the plaintiffs in Texas, the Fifth Circuit held that these contacts alone—in the absence of the defendants' performance in the forum state—did not establish minimum contacts with Texas. *Id.*

As in *Stuart*, the Agreement contained a Texas choice-of-law clause and the Texas plaintiff performed its work in Texas. These factors were inadequate for personal jurisdiction over the nonresident defendant in that case. As in *Moncrief* and *Stuart*, the only reason the plaintiff's activities under the contract occurred in Texas was the fortuity of the plaintiff's location in the State.

In this case, there is no clear center of activity outside Texas—such as Russia was in *Moncrief*, Africa was in *Freudensprung*, or Oklahoma was in *Holt Oil & Gas*—that led the courts in those cases to find no personal jurisdiction in Texas. But the record evidence also shows that the Agreement was not "centered" in Texas. Unlike the contractual performance in *Transpo* and *Central Freight Lines*, the forum state was not the "hub"; PPO Check could have performed its work anywhere. The only reason work under the Agreement was done in Texas was the fortuity that PPO Check's office was located there. The account deficiencies that PPO Check audited arose out of healthcare services provided by the defendants in either Oklahoma or Illinois. Only one-fifth of the accounts PPO Check audited involved third-party payors based in Texas.

The parties' contractual performance does not support a minimum-contacts finding.

**D.    Summary**

As noted, some of the facts disclosed in this record are similar to some aspects of cases in which courts found personal jurisdiction over a nonresident defendant. Some of the facts are similar to cases in which courts have refused to find personal jurisdiction. The following record evidence supports the finding that the defendants lack the contacts with Texas necessary for personal jurisdiction over them: PPO Check solicited the defendants' business in Illinois and traveled to Illinois to negotiate the Agreement; neither the terms of the Agreement nor the parties' conduct under it require performance in Texas or make the Texas location a material aspect of the Agreement; the nature of PPO Check's work under

the Agreement was such that it could have been performed anywhere and the only reason PPO Check performed the audit work in Texas was the result of the fortuity that it had its office there; and the defendants' contract performance was communicating with PPO Check from Illinois and Oklahoma and sending payments to PPO Check.  Under *Stuart* and similar cases, these activities are insufficient to support the exercise of specific personal jurisdiction.

There is no forum-selection clause requiring Texas as the venue to resolve conflicts. Entering into a contract with a Texas entity, even with the Texas choice-of-law clause, mailing payments to Texas, and communicating with PPO Check in Texas from Illinois and Oklahoma, do not establish minimum contacts over the Illinois and Oklahoma defendant hospitals and their Illinois management company.  To subject these defendants to personal jurisdiction in Texas would essentially be based on the fortuitous circumstance that PPO Check is located in this State and therefore performed its work in Texas, and the fact that the contract contained a Texas choice-of-law clause.  The defendants' contacts with Texas do not support the "necessary inference of purposeful availment."  *Hydrokinetics*, 700 F.2d at 1029–30.

Moreover, even if the defendants had contacts sufficient to exercise jurisdiction, the exercise of that jurisdiction would offend the traditional notions of fair play and substantial justice.  *See Int'l Shoe Co.*, 326 U.S. at 158.  In deciding whether it is fair and reasonable to require a nonresident to defend in Texas, a court must consider several factors: (1) the burden upon the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest

32

in securing relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.  *Central Freight Lines*, 322 F.3d at 384 (citations omitted); *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 324 n.9 (5th Cir. 1996). Here, the defendants' business is primarily local, providing healthcare services in Illinois and Oklahoma.  Litigating in this State would be a burden on the nonresident hospitals. Moreover, Texas has no greater interest in this suit than Oklahoma or Illinois.  This is a breach of a contract suit involving a contract among citizens of Texas, Oklahoma, and Illinois over money allegedly due from collections of payors' accounts located around the country, for patient health care provided in Oklahoma and Illinois.  PPO Check's interest in seeking relief in its home state does not justify haling the defendants into court in Texas.

## IV.    Conclusion

The motion to dismiss for lack of specific personal jurisdiction is granted.  No later than **July 27, 2007**, the parties must advise the court whether an order of dismissal or a schedule for resolving any issues relating to general jurisdiction should be entered.

SIGNED on July 10, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

33